IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CR NO. 2:12CR193-MEF |
| | ) | |
| VERNON HARRISON | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Before the court is Defendant's Motion to Suppress (Doc. 32). Defendant ("Harrison") seeks to suppress "the statement he made to law enforcement on March 23, 2012, as well as any fruits of any searches from any consents to search [he] may have signed." Mot. (Doc. 32) at 1.

On January 10, 2013, the undersigned held an evidentiary hearing on the Motion. Felix Montelara, Special Agent with the United States Postal Service, Office of the Inspector General ("Agent Montelara"), David McDaniel, Special Agent with the Internal Revenue Service - Criminal Investigation ("Agent McDaniel"), and Harrison testified at the hearing.

Upon consideration of the Motion to Suppress (Doc. 32), the testimony at the evidentiary hearing, and the briefs filed in support of and in opposition to the motion, the undersigned Magistrate Judge RECOMMENDS that the Motion to Suppress (Doc. 32) be DENIED.

I.      FACTS

Based on the testimony at the hearing held on January 10, 2013, and to a preponderance of the evidence, the court finds the operative facts as follows:[1]

At the time of the events in question, Harrison was employed by the United States Postal Service as a mail carrier. Harrison had been employed with the United States Postal Service since 1994 and worked at the South Station Post Office in Montgomery, Alabama. Harrison is charged with one count of conspiracy to file false federal income tax returns, eight counts of mail fraud, eight counts of aggravated identity theft, and six counts of mail embezzlement. It is alleged Harrison removed certain mail items from the mail stream as part of an alleged fraudulent tax preparation scheme. On March 23, 2012, Agents Montelara and McDaniel were conducting surveillance of Harrison as he completed his route as a mail carrier.

On March 23, 2012, at approximately four o'clock in the afternoon, Agents Montelara and McDaniel approached Harrison at his workplace, in the South Station Post Office, after he had completed his mail route for the day. The agents identified themselves as federal agents and asked Harrison if they could speak with him. Harrison agreed to speak to the agents and he accompanied them into the postmaster's office, where the agents interviewed him. The agents were dressed in business casual attire.

---

[1] The court reaches findings of fact at a suppression hearing based on a preponderance of the evidence. *United States v. Beechum*, 582 F.2d 898, 913 n.16 (5th Cir. 1978) (citing *Lego v. Twomey*, 404 U.S. 477, 489 (1972)).

The agents did not display their weapons and they did not tell Harrison that he was under arrest.

The encounter began with the agents introducing themselves and presenting Harrison with their credentials. The agents then asked some biographical questions and completed a personal history form with information such as contact information, physical description, and marital and employment status. As the agents asked Harrison personal history questions, he asked some of his own questions. Specifically, Harrison was concerned about losing his job and about being arrested in front of his family. The agents told Harrison they would not arrest him that day.

Sometime in the beginning of the interview and before Harrison made any incriminating statements, Agent Montelara provided Harrison with a *Miranda* Rights Warning and Waiver form. Agent Montelara asked Harrison to read paragraph one out loud and then to read the rest of the document on his own and to ask the agents any questions, if he had any. Agent Montelara then asked Harrison to initial items one through seven, and, if he agreed, to sign and date the bottom of the document. Harrison did not ask any questions regarding the form and he signed and dated the document.

Sometime during the interview, Harrison told the agents he has a history of diabetes and PTSD. Agent Montelara asked Harrison if he took insulin and he responded that he did not. Harrison said he takes some medication. Agent Montelara asked Harrison if he had taken his medication that day and Harrison said that he had not done so. During the interview, Harrison held his head in his hands several times, he was

3

sweating, and, at one point, stood up against the wall. At no point, did Harrison ask to end the interview. Harrison continued to answer questions posed to him and provided coherent responses.

Near the conclusion of the interview, the agents asked Harrison to handwrite a statement and he did so. Harrison wrote a two and one half page statement using a form labeled "SWORN STATEMENT" on the front page. The agents then asked Harrison for consents to search his work locker and vehicle. The agents provided Harrison with two consent to search forms—one for consent to search his "carry bags and personal items" and one for consent to search his "automobile"—and Harrison signed both forms. The agents and Harrison walked over to his locker. Harrison opened the locker for the agents and the agents searched the locker. Harrison and the agents then walked to the parking lot of the post office where Harrison's vehicle was parked and the agents conducted a search of the car. At the conclusion of the search, Harrison got into his vehicle and drove away.

The entire encounter, from the time the agents approached Harrison in the post office to the time Harrison drove away, lasted approximately three hours. The agents did not physically restrain Harrison in any way during the interview nor did they tell Harrison he was under arrest.

## II.    HARRISON'S CLAIMS

In his Motion to Suppress, Harrison argues that "[t]he defendant's waiver of his *Miranda* rights and incriminatory statements were involuntarily made as a result of the

effects from the diabetes and the coercive tactics the law enforcement agents utilized." Mot. (Doc. 32) at 3.  Because the determination of whether or not Harrison was in *Miranda* custody at the time of the interview in question is interrelated to Harrison's claim that his *Miranda* waiver and subsequent statement were involuntarily made, the court will address that question first.

### III.   DISCUSSION

#### A.   Whether Harrison was in custody.

In opposition to the motion, the Government notes "[t]o begin, the defendant was not in custody when interviewed by law enforcement and hence the agents were not required to give him *Miranda* warnings." Gov.'s Resp. (Doc. 36) at 3 (citing *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006)).  The court agrees with the Government.

The entitlement to *Miranda* warnings attaches only "when custodial interrogation begins." *United States v. Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *Brown*, 441 F.3d at 1347 (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *see also United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (Whether a suspect is in custody "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." (quotation marks and alterations omitted)).  "The test is

objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya,* 74 F.3d 1117, 1119 (11th Cir. 1996). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable innocent person." *United States v. Street*, 472 F.3d 1298, 1309 (11th Cir. 2006) (quoting *Moya*, 74 F.3d at 1119). The court must make a determination based on the "totality of the circumstances," and must consider several factors, "including whether 'the officers brandished weapons, touched the suspect, or used language or a tone that indicated that compliance with the officers could be compelled.'" *Id.* (citing *Brown,* 441 F.3d at 1347, 1349 and quoting *United States v. Long*, 866 F.2d 402, 405 (11th Cir. 1989)). The defendant bears the burden of establishing he was in custody and that his statements were made in response to government questioning. *See United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant shows that a confession was obtained while he was under custodial interrogation, the government then has the burden of proving that the defendant voluntarily waived his privilege against self-incrimination.").

The evidence supports a finding that the interview in question constituted a voluntary encounter. Harrison was approached by Agents Montelara and McDaniel at his workplace, they asked him if he would be willing to speak to them, and he agreed to do so. Harrison could have simply declined to speak to them. The agents never told Harrison he was under arrest or that he was not free to decline the interview and leave, and they spoke to him in a "normal" tone of voice during the interview. Moreover, there

is no evidence of physical contact or control of Harrison by the agents nor did they threaten physical force. At no point did the agents display their weapons or handcuff Harrison. *See, e.g.*, *United States v. Mittel-Carey*, 493 F.3d 36, 40 (1st Cir. 2007) ("[T]he element that carries the most weight is the level of physical control that the agents exercised over the defendant during the search and interrogation.").

In this case, the manner in which the agents conducted the interview "did not involve the type of 'highly intrusive' coercive atmosphere that may require *Miranda* warnings even before a formal arrest is made." *Acosta*, 363 F.3d at 1151. Rather, "[t]he totality of the circumstances were such that a reasonable person in [Harrison's] position would not have believed that he was utterly at the mercy of the police, away from the protection of any public scrutiny, and had better confess or else." *Id.*

Harrison did not present evidence to support a finding that he was in custody for the purposes of *Miranda* and, therefore, did not carry his burden. Neither does the totality of the circumstances support a finding that he was restrained in a manner akin to formal arrest when he made the statement at issue. Thus, no *Miranda* warning was required.

### B. Whether Harrison's *Miranda* waiver and subsequent incriminatory statement were voluntary.

Even were the court to assume Harrison was in *Miranda* custody during the interview, for the reasons that follow, the court finds that Harrison validly waived his *Miranda* rights.

7

It is undisputed that Agents Montelara and McDaniel advised Harrison of his *Miranda* rights from a standard form on March 23, 2012. There is also no question that Harrison signed the waiver portion of the form. *See* Tr. 90-91.

*Miranda* protects a person's Fifth Amendment privilege against self-incrimination under the United States Constitution by requiring law enforcement authorities to advise a person, who is subject to a custodial interrogation, of certain rights and to respect the person's invocation of those rights. *Moran v. Burbine,* 475 U.S. 412, 420 (1986). A defendant may waive these *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Thus, in order to determine whether a defendant's *Miranda* waiver is valid, the court must engage in a two-part inquiry:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. at 421 (quoting *Fare v. Michael C.,* 442 U.S. 707 (1979) (citations omitted)). Harrison correctly points out that, in determining whether his statement to law enforcement was coerced, and, thus, involuntarily given, "[a] court must consider the totality of the circumstances, focusing both on the nature of the defendant and the

techniques used by law enforcement."[2]  Mot. (Doc. 32) at 3 (citing *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973)).  However, while the inquiry is one of the "totality of the circumstances," "[a] signed *Miranda* waiver is usually strong evidence that the defendant waived his rights, [though] it is not necessary."  *United States v. Bernal-Benitez*, 594 F.3d 1303, 1319 (11th Cir. 2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)).

### 1. *Whether the waiver was voluntary.*

The United States Supreme Court has noted that "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion."  *Colorado v. Connelly*, 479 U.S. 157, 170 (1986) (citation omitted).  Thus, "[t]he voluntariness of a waiver of this [Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word."  *Id.* (citing *Moran*, 475 U.S. at 421 and *Fare*, 442 U.S. at 726-27).  "Therefore, in the absence of police coercion, a court cannot conclude a defendant's waiver or inculpatory statements are involuntary."  *United States v. Maddox,* 2010 WL 4312922, at *11 (N.D. Ga. Sept. 7, 2010), adopted by 2010 WL 4312905, at *1 (N.D. Ga. Oct. 22, 2010) (citation and internal marks omitted).

There is no evidence of coercion or police overreaching in this case as the record establishes that Harrison was neither compelled nor induced into waiving his *Miranda*

---

[2] The court applies the same standard in determining whether a *Miranda* waiver was valid and whether a confession was voluntary.  *See Colorado v. Connelly*, 479 U.S. 157, 169-70 (1986).

rights. There is no evidence that either agent threatened Harrison or made a promise in exchange for a waiver of his *Miranda* rights or a confession. The agents used a "normal" tone of voice during the interview, *see* Tr. 26 & 39, and at no point did they display their weapons or handcuff Harrison. There is no evidence of physical contact or control of Harrison by the agents and the agents never threatened any physical force. Indeed, Harrison does not argue that the agents used or threatened to use physical force or restrained him in any way.

To the extent Harrison argues coercion by alleging that "the law enforcement agents threatened the defendant that he would be arrested in front of his wife and young daughter unless he told them what they wanted him to say," Mot. (Doc. 32) at 2, the court finds this argument unpersuasive. First, at the hearing, Agents Montelara and McDaniel both denied ever threatening to arrest Harrison in front of his family. In fact, the agents testified that they did quite the opposite, assuring Harrison that they would not arrest him in the presence of his family.[3] The court found the testimony of the agents to be credible.

---

[3] At the hearing, Agent Montelara testified as follows:
> Q. Now, you said he mentioned -- asked questions about also, in addition to losing his job, being arrested. What did you say in response to that?
> A. We told him -- I remember telling him that we were not going to arrest him that day, right there. That he would go home. And concerning the job, the Office of Inspector General has no bearing on his job situation, and he would have to deal with that with management.

Tr. 13.
> Agent McDaniel testified as follows:
> A. One of his major concerns was whether or not he was going to be arrested today, and he was concerned that he and his wife would experience marital problems due to this. And we informed him that, you know, he was not going to be arrested today, and we tried to give him reassurance that he would be able to figure his life out and that sort of -- you know, just reassurances.

The court also notes that the interview took place at Harrison's place of work, which lends less credibility to the alleged threat since his wife and daughter were not present in the post office at the time of the interview. Thus, to the extent Harrison seeks to argue police overreaching, his argument is due to fail. *See, e.g.*, *Castillo-Mejia v. Sec'y, Dep't of Corr.*, 2010 WL 2836744, at *4 (M.D. Fla. July 19, 2010) ("[T]o the extent Petitioner asserts that the waiver of his *Miranda* rights was coerced by promises of leniency if he signed the *Miranda* form, and threats of life imprisonment if he refused to sign the form, this Court finds the waiver was not coerced. Sgt. Magria testified at the suppression hearing that he never told Petitioner that if he did not sign the form he would go to prison for life, and he never told Petitioner that if he signed the form he could get out of jail quickly.").

---

> Q. Did you ever tell him or threaten him in any way that you would arrest him in front of his family at all?
> A. No, sir. Actually, we informed Mr. Harrison that we would not do that. I told Mr. Harrison that I had every intention of treating him as well as I would want to be treated. In fact, he was so concerned with his wife being upset with him that I told him that if I had anything to give him or to contact him, I would just call his cell phone and arrange a place for us to meet instead of coming to his house.
> Q. And, in fact, at a later date, did you serve him with a target letter?
> A. I did.
> Q. How did you serve that target letter?
> A. I called Mr. Harrison on his cell phone and asked him to meet me at the IRS building.
> Q. So you didn't go to his house in front of his family to do that even?
> A. No, sir.

Tr. 40-41.

### 2. *Whether the waiver was knowing and intelligent.*

To be knowing and intelligent, "the [*Miranda*] waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran*, 475 U.S. at 421.

Harrison asserts that his *Miranda* waiver and subsequent incriminatory statement were involuntarily made because he was having a diabetes attack at the time of the interview. Mot. (Doc. 32) at 2-3. Harrison points the court to *United States v. Watson*, 469 F.2d 362 (5th Cir. 1972), and asserts that:

> This case is very much similar to *Watson* in that in and around the time that Mr. Harrison was being advised of his rights, he was experiencing severe health conditions from his diabetes. The defendant in this case was obviously ill because the law enforcement agents themselves asked him if he was feeling okay and the interrogation was stopped on at least two separate occasions due to the defendant's health problems, i.e., diabetes. Because of the defendant's diabetes, his cognitive ability was obstructed to the point that any waiver and/or subsequent incriminatory statements were not provided knowingly and voluntarily.

Mot. (Doc. 32) at 4.

After reviewing the record, the court finds that *Watson* is inapposite to the case at hand. In *Watson*, the defendant was in police custody and had been taken to the hospital for an insulin shot after he informed officers that he was going into hyperglycemic shock. *Watson*, 469 F.2d at 365. Shortly after his return to jail from the hospital, two FBI agents arrived to interview Watson. *Id.* As the agents began to read Watson his *Miranda* rights, Watson informed them that he was going into insulin shock, which results from an oversupply of insulin, and requested a soda. *Id.* The agents obliged, but very soon after

giving him the soda, finished reading Watson his rights and obtained a signed waiver. *Id.* On appeal, the United States Court of Appeals for the Fifth Circuit, determined that "[t]he totality of circumstances indicate[d] that Watson may possibly have been disoriented when asked to waive his rights." *Id.* at 367. Thus, the court remanded "to the district court for a redetermination by that court on the question of voluntariness of the confession and knowing waiver." *Id.* No such circumstances are present in this case. While, Harrison testified that he felt ill immediately upon returning from his mail route and planned on leaving the post office right away in order to take his medication, he agreed to speak to the agents and was interviewed for three hours and never asked to end the interview during that time. Harrison testified that he simply kept answering questions in hopes of ending the interview quickly.[4] Harrison also testified that he repeatedly told the agents he had to take his medication.[5] However, the agents testified that Harrison

---

[4] At the hearing, Harrison testified as follows:
> A. . . . my head was just spinning. I was like -- I was becoming really nauseated, so I moved the chair back and I stood up. I was against the wall. When I stood up, both of them -- well, I saw Mr. McDaniel right here by the desk. He kind of stood up and looked. Only Montelara -- all I saw Montelara do was, you know, it appeared like he might have been reaching for something. I can't say for sure, but I just saw this (indicating). He was like, are you okay? I was like, I'm not. So I was like this and shaking a little bit, a little trembling, and they said, okay. They went out again. And I had some Lifesavers, hard candy in my pocket. I just took about two or three of those, and I just sat there. I tried to gather my thoughts, but everything was – everything was foggy. My head was still pounding. I felt like I was going to throw up. Muscles and stuff were tight. I was like, something's not right here, but I was like, get through this. Don't worry about it. Keep moving. Keep moving. Keep moving. Keep moving. You know. Because we were taught, you know, in the Army to keep moving. Keep moving.

Tr. 72-73.

[5] At the hearing, Harrison testified as follows:

13

stated that he was on medication and that he had not taken it that day, but that never during the interview did he state he needed to take his medication nor did he ask to end the interview in order to take his medication. *See* Tr. 16, 19, 34, 42, & 57. The fact that Harrison was able to provide coherent responses to the questions throughout the interview supports the agents' testimony that he appeared lucid and alert at all times, including the periods before and after he signed the *Miranda* waiver.[6] Not only did Harrison continue answering questions without any apparent difficulty, he also wrote out a two and one half page statement and did not display any difficulty in writing such statement. The statement is written legibly and is coherent. The court also notes that Harrison presented no medical evidence that he actually suffers from diabetes and PTSD, even though he was repeatedly given the opportunity to do so.[7] After hearing the

---

> Q. Okay. Now, during the course of this interview, you made it clear that you needed to take medication for diabetes; is that right?
> A. Yes, sir, I did.

Tr. 73. *See also* Tr. 67.

Harrison also testified that one of his medications is ACTOplus, a medication used to treat Type 2 diabetes for patients who are not on insulin. Tr. 65.

[6] *See, e.g.*, *United States v. Galvan-Mena*, 2008 WL 5423576, at *4 (S.D. Ill. Dec. 29, 2008) (waiver of *Miranda* rights valid even though defendant claimed to be suffering from diabetes-related illness because officers testified that defendant appeared coherent at all times and "at no time did [defendant] indicate that he was diabetic, that he was not feeling well, or that he needed to eat, take medication, or see a doctor").

[7] Per Harrison's request, *see* Mot. (Doc. 32) at 4, the court scheduled the hearing on this motion at a date that would allow him enough time to secure a diabetes expert to testify at the hearing. Harrison did not present such expert testimony at the hearing. The court then ordered that the suppression hearing reconvene at a later date in order to allow for a medical expert to testify on Harrison's behalf. *See* Tr. 102-04; Order (Doc. 49). However, Harrison then notified the court he would not be presenting expert testimony in support of his motion to suppress. *See* Notice (Doc. 50).

testimony presented at the hearing and considering Harrison's coherent responses during the interview and the coherency of his two and one half page hand-written statement, the court does not find credible Harrison's testimony regarding the severity of the symptoms he was experiencing during the questioning.

In opposing the motion to suppress, the Government points this court to *United States v. Harrold*, 679 F. Supp. 2d 1336, 1351 (N.D. Ga. 2009). After reviewing the relevant case law, the court finds the facts of *Harrold* to be more aligned with this case than *Watson*. Like *Harrold*, in this case, Harrison informed the agents he had diabetes, but, "unlike in *Watson*, []he did not state that []he was suffering from high blood sugar or was otherwise impaired as a result of h[is] diabetes." *Harrold*, 679 F. Supp. 2d at 1351. Harrison displayed some physical signs that could be interpreted as nervousness or discomfort—sweating, holding his head in his hands, dry mouth, and getting up and standing against the wall—but these were not signs that would ordinarily indicate a diabetes attack and Harrison never indicated he was having such an attack. While Harrison may have complained in general terms that he was not feeling well and thought he was having a diabetes attack, he did not ask the agents to stop the questioning or request medical attention as was the case in *Watson*.[8]

---

[8] *See, e.g.*, *United States v. Bazzle*, 2012 WL 996501, at *5 (E.D. Pa. Mar. 23, 2012) (holding statements were made voluntarily and noting "[t]he record, however, contains no support for Bazzle's contention that any police officer knowingly withheld medication from him. . . . Bazzle never told anybody that he had to take medicine while in the custody of the police. Bazzle did not make clear that he was an insulin-dependent diabetic, and the record contains no evidence that Bazzle appeared disoriented, unable to understand or answer questions, or that his medical condition rendered him incapable of voluntarily waiving his *Miranda* rights. To the contrary, he affirmatively answered that he understood his *Miranda* rights and proceeded to provide lucid

The court also notes that "[a] signed *Miranda* waiver is usually strong evidence that the defendant waived his rights." *United States v. Bernal-Benitez,* 594 F.3d 1303, 1319 (11th Cir. 2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)). In this case, Agent Montelara provided Harrison a written *Miranda* Rights Warning and Waiver form, which he asked Harrison to review and initial. While Harrison testified that he did not read the form, the undisputed evidence establishes that he initialed each enumerated right and signed and dated the form at the bottom. *See* Tr. 10-11. Moreover, Harrison did not state nor did he give any indication that he had any trouble reading or understanding the form or his rights as written on the form and he did not ask Agent Montelara to repeat anything or any questions regarding the form. *See, e.g.*, *Harrold*, 679 F. Supp. 2d at 1351 (finding *Miranda* waiver valid and noting that "[a]s Agent Myers read Glass her *Miranda* rights, Glass read along from the written advice-of-rights form. Glass did not ask Agent Myers to repeat anything or ask any questions, or give any indication that she did not understand what was being read. Glass signed the *Miranda* waiver form . . . . At no point during the interview did Glass ask to end the interview or to speak with an attorney." (citations omitted)); *United States v. Longoria*, 2009 WL 3366016, at *15 (N.D. Ga. Oct. 15, 2009) (finding waiver valid where "[t]he evidence shows that Longoria was an adult and that he did not ask for clarification, stop the interview, or otherwise indicate in any way that he did not understand his rights or the consequences of his waiver.") (internal citations omitted)).

---

written answers to the questions posed to him.").

The record contains no evidence that Harrison appeared disoriented, unable to understand or answer questions, or that his medical condition rendered him incapable of voluntarily waiving his *Miranda* rights.  Accordingly, the court finds the Government has met its burden of establishing that Harrison was provided with his *Miranda* rights, he voluntarily, knowingly, and intelligently waived these rights and, thus, his post-*Miranda* statement was also voluntary.[9]

### C. Whether the consents to search were voluntary.

Harrison also argues that "[t]he government obtained consents to search from the defendant during the same March 23, 2012 meeting," and "[f]or the same grounds set forth herein, the Defendant moves that the fruits of any such searches be suppressed." Mot. (Doc. 32) at 4.

A consent to search is voluntary "if it is the product of an 'essentially free and unconstrained choice.'" *United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973)).  As with the waiver of an individual's *Miranda* rights, in determining the validity of a consent to search, the court must engage in a factual inquiry based on the totality of the circumstances. *Schneckloth*, 412 U.S. at 248-49.

---

[9] *See, e.g*, *United States v. Flores*, 380 F. App'x 921, 925 (11th Cir. 2010) ("When police give the *Miranda* warnings and receive a waiver from the defendant, this generally produces 'a virtual ticket of admissibility; maintaining that a statement is involuntary even though given after warnings and voluntary waiver of rights requires unusual stamina, and litigation over voluntariness tends to end with the finding of a valid waiver.'" (quoting *Missouri v. Seibert*, 542 U.S. 600, 608-09 (2004)).

As discussed above, in this case, Harrison does not claim the agents threatened force or violence against him or even that they were verbally abusive. At no point did the agents display their weapons or point them at Harrison. Harrison was not handcuffed, and the agents testified that they did not threaten Harrison with physical force, or with an arrest as alleged, and they spoke to him in a "normal" tone. *See* Tr. 26 & 39. The evidence also established Harrison cooperated with the agents, accompanying the agents to his locker and vehicle. Additionally, there is no allegation that Harrison's education and intelligence prevented him from voluntarily consenting or understanding the nature of his signed consent to search forms. As to Harrison's argument regarding his health condition due to his diabetes, as discussed above, the court does not find that Harrison's diabetes affected his ability to waive his *Miranda* rights nor does the court find that his diabetes affected his ability to knowingly and voluntarily consent to a search of his locker and vehicle. Thus, the court finds Harrison knowingly and voluntarily consented to the search of his work locker and vehicle and his motion to suppress is due to be denied.

## IV.   CONCLUSION

For the reasons stated above, it is the RECOMMENDATION of the Magistrate Judge that Harrison's Motion to Suppress (Doc. 32) be DENIED.

It is further

ORDERED that on or before **April 19, 2013**, the parties may file objections to the Recommendation. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which a party objects. Frivolous, conclusive or

general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a *de novo* determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Sec., Inc.*, 667 F.2d 33 (11th Cir. 1982); *see also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981) (en banc) (adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981).

Done this 5th day of April, 2013.

/s/ Wallace Capel, Jr.
WALLACE CAPEL, JR.
UNITED STATES MAGISTRATE JUDGE